UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEREMY SCOTT EICKENHORST,

　　　　　　　　Petitioner,

　　　　v.

CONNIE GIPSON,

　　　　　　　　Respondent.

No.  2:12-cv-2363 TLN DAD P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on May 27, 2009, in the San Joaquin County Superior Court on for five counts of committing a lewd act upon a child under the age of 14 years, in violation of California Penal Code § 288(a); and one count of misdemeanor possession of child pornography, in violation of California Penal Code § 311.11(a); with a jury finding that petitioner's crimes were committed against more than one victim.  Petitioner seeks federal habeas relief on the following grounds:  (1) the willful destruction of evidence by an agent with the California Department of Justice violated his right to due process; (2) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment; and (3) misconduct by the lead detective investigating his case violated his right to due process.  Upon careful consideration of the record and the applicable /////

1

law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal,[1] the California Court of Appeal for the Third Appellate District provided the following factual summary:

> A seven-year-old girl from Kern County; an eight-year-old girl from Tulare County; and the eight year old's cousins from San Joaquin County, aged six and seven, reported to their respective mothers and then to the police that defendant Jeremy Scott Eickenhorst had either touched or asked to see their "privates" and told each of them to keep it a secret. The mothers testified that defendant had been alone with young and disabled children behind closed doors. The police confiscated his computer and found thumbnail images of child pornography.
>
> A jury convicted defendant of five counts of committing a lewd act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a)) FN1 and one count of misdemeanor possession of child pornography (§ 311.11, subd. (a)), and found true the allegation that the crimes were committed against more than one victim (§ 667.61, subd. (e)(5)). The court sentenced defendant to state prison for 75 years to life.
>
> FN1. All further statutory references are to the Penal Code unless otherwise indicated.
>
> On appeal, defendant contends the trial court applied the wrong standard of review in denying his motion for a new trial and failed to instruct the jury sua sponte on lesser related offenses. He also alleges insufficiency of the evidence and sentencing error. We affirm.
>
> **FACTS**
>
> **Who's Who?**
>
> During the time defendant was accused of committing lewd acts with the four little girls, he was studying to become a special education teacher in Kern County. His mother, Jennie, had been a caseworker for the Kern Regional Center for people with developmental disabilities. She hosted a support group for mothers of children with disabilities, including an annual pool party. She became close friends with several of the mothers in the group, including Laurie F., whose daughter Jessica was one of the victims;

---

[1] Answer filed November 18, 2014 [ECF No. 25], Exhibit 1 [ECF No. 25-1] (hereinafter "Opinion").

D.P., whose autistic son engaged in some bizarre behaviors after defendant babysat him; and Sheila L., whose five-year-old daughter Allison was also at a pool party with her brother, who was also severely disabled.FN2

FN2. Only the minors and their parents whose given names are not among the 1,000 most popular birth names during the last nine years (according to statistical information provided by the Social Security Administration) will be designated by initials, in order to reduce confusion and improve readability.  (In re Branden O. (2009) 174 Cal.App.4th 637, 639, fn. 2, 94 Cal.Rptr.3d 520; In re Edward S. (2009) 173 Cal.App.4th 387, 392, fn. 1, 92 Cal.Rptr.3d 725; Cal. Rules of Court, rule 8.400(b)(2).)

Defendant's stepfather, Rick, was related to the parents of the other child victims.  Don and Jenny C. lived in San Joaquin County with their three children, A.C. and Brenna, who were victims, and D.C.  Don's sister, K.C., lived in Tulare County with the fourth victim, Nicole C.  Defendant attended holiday celebrations with this branch of the family.

Laurie, D.P., Jenny, and K.C. all testified that defendant spent time with the young children that made them uncomfortable.  They ignored or minimized their discomfort, rationalizing that defendant enjoyed the children's company because he was going to be a teacher.

As an expert testified is common with young victims of molestation, Jessica, A.C., Brenna, and Nicole kept the secret for a period of time as defendant had instructed them, and only over time did the truth dribble out, first to their mothers and then to the police.  But, as is also often the pattern, some of the victims recanted portions of their allegations at trial.

**Disclosures**

**A.C. and Brenna**. On July 4, 2006, A.C. told her mother that she had just seen defendant with her younger sister, Brenna, through a crack in the door.  There are various versions of what she told her mother, but suffice it to say, her mother reacted immediately and asked her husband to make defendant leave the house.  Although the two girls provided few details, their mother called the police the following day.

On July 5, 2006, Officer Kami Ysit interviewed nine-year-old A.C. and seven-year-old Brenna.  A.C. told Officer Ysit that on three or four occasions, defendant asked to see her private parts.  She routinely told him no.  She did, however, allow him to put his hands on her hips, and he told her that it was their secret.  On one occasion in particular, she made a deal with him that he would allow her to play his World of Warcraft computer game if she let him touch her hips.  She also told Officer Ysit that she had seen defendant and her sister sitting on the floor in their bedroom facing each other with their legs spread apart.  She told her mother because

3

she was afraid he was doing something to Brenna and would try to see her private parts.

Brenna expressed her concern to Officer Ysit that defendant would not be able to become a teacher.  Nevertheless, she told her that while they were alone in her room the previous day, defendant asked to see her private parts.  Because she trusted him, she pulled down her pants and underwear to show defendant.  He told her not to tell anyone; it was their secret.  Once her clothing was pulled up, she sat in defendant's lap and they rocked back and forth.  Defendant touched her front and back private parts with his hand over her clothing.  Brenna also stated defendant showed her his front private part either on this or another occasion.  He pretended to be reading a Garfield book when someone knocked on the door.

A month later the girls were interviewed by a social worker.  They gave a diluted version of the facts they had provided Officer Ysit, but Brenna did tell the social worker that defendant touched her vagina and bottom with his hand over her clothing, and A.C. told her that defendant asked to see her private parts on several occasions.

At trial, both girls recanted some of the more egregious allegations.  A.C. testified that defendant had asked to see her private parts, but she insisted she refused.  She stated she had made a deal with defendant to show him her private parts if he allowed her to play World of Warcraft, but she insisted that although she played the game she would not allow him to see her.  She repeated that defendant told her to keep secret his request to see her private parts.  She denied that defendant ever touched her in an inappropriate way.

Similarly, Brenna backtracked on what she had told Officer Ysit.  She too denied that defendant had touched her private parts.  She did remember being alone with him, but she could not remember what had happened.  He did, however, ask her to show him her private parts, and she would sit on his lap when he read to her.

**Nicole**. After learning of her nieces' accusations against defendant, K.C., who had been molested as a child, "grilled" her daughter Nicole to ascertain if anyone had touched her inappropriately.  Nicole, afraid of getting into trouble and of upsetting her mother, denied that anyone had touched her.  A couple of years later, however, she confided in her cousins A.C. and Brenna, and ultimately in her mother.

In May 2008 Officer Erik Martinez interviewed Nicole.  She told him about two separate incidents.  First, around Thanksgiving of 2005, when she was eight years old, she hid with defendant in a closet during a game of hide and seek.  According to Nicole, defendant touched her "sacred place" (her vaginal area) over the top of her clothing.  Defendant told her it was a secret and not to tell anyone.

The second incident occurred a few months later at her mother's house while defendant was babysitting.  Again, defendant lured her

into a closet, purportedly to tell her something private, and again touched her vaginal area and buttocks over her clothing.  Defendant told her to keep it a secret.

Nicole's trial testimony was consistent with her police interview.

**Jessica**. Although Jessica was the first of the girls to be molested by defendant in the summer of 2004, she did not tell her mother until January of 2008.  At that time, she told her mother, Laurie, that defendant had put his hand underneath her bathing suit top. Jessica was concerned about Laurie's relationship with defendant's mother, Jennie.  Indeed they were close friends; in addition, Jennie was Laurie's son's caseworker and advisor on how to handle difficult behavioral issues.  Despite the friendship, Laurie contacted the police.

A social worker from child protective services interviewed Jessica. Her statement to the social worker was consistent in all material respects with her trial testimony.  After getting out of the pool during the swim party at defendant's house, several of the children accompanied defendant to his room to watch television.  Defendant sat on his bed between Jessica and five-year-old Allison.  As Jessica started to doze off, she awoke because defendant was touching her breast area over the top of her bathing suit.  She fell asleep, only to awaken again with defendant touching her breast area underneath her bathing suit top.  She told him to stop.  He did, but asked to see her private parts and offered:  "I'll show you mine if you show me yours."

Jessica also recounted that several months later, she returned to defendant's house with her mother and brother following a fight between her mother and stepfather.  According to Jessica, defendant approached her with a "weird grin" on his face and asked her, "Are you going to show me," a reference, she believed, to her private parts.  She pretended he meant a toy and said she did not bring it.

**The Defense**

Defendant testified in his own defense, denying all of the allegations each of the girls made against him.  He could not explain why they would fabricate sexual misconduct allegations. He claimed to have had several girlfriends.  He also testified that he did not download the child pornography on his computer, and he did not know the images were there.  He admitted he lied to the police about various details, explaining that he was scared.  He expressed profound disappointment that his teaching career had been permanently derailed.

His expert psychologist had little experience with child molesters. Nevertheless, following her interview with defendant, she concluded he was not a pedophile, sociopath, or psychopath.

Several of his mother's friends testified, with mixed results.  His mother's best friend testified that defendant began babysitting her two children when they were about 11 and 12, and he did not touch

either child inappropriately.  While D.P., Jessica's voice coach, testified that Jessica told her defendant had touched her outside her bikini top, she also testified she had uncomfortable suspicions about defendant because of her son's bizarre behavior after defendant babysat him.  Matthew, who has autism and cerebral palsy, repeatedly punched his penis, saying "diaper, diaper," his word for penis, and began licking his mother's arm.  He would not allow his mother to bathe or change him.  Nor would he allow the personnel at the school he started a few days after defendant babysat him to change his diaper.  The behavior diminished over time.

Contrary to Laurie's testimony, Sheila denied that Laurie expressed discomfort about defendant's being in the room with the girls and asked her to check on them.  Sheila did not remember telling Laurie that defendant had touched Allison.  She did testify, however, that she felt uncomfortable seeing defendant on the bed between nine- and five-year-old girls.

A computer forensic expert also testified on defendant's behalf, but his testimony will be summarized within our discussion of the issues involving the child pornography found on defendant's computer.

People v. Eickenhorst, No. C062613, 2011 WL 2436216, at *1-4 (Cal. App. 3d Dist. June 17, 2011).

        After the California Court of Appeal affirmed petitioner's judgment of conviction on appeal, he filed a petition for rehearing, arguing that the Court of Appeal should "consider whether the trial court abused its discretion when it refused the defense request to impose a non-one strike sentence as to three of the four complaining witnesses." (Notice of Lodging Documents in Paper filed November 18, 2014 [ECF No. 26], Resp't's Lod. Doc. 6.)  The California Court of Appeal summarily denied the petition for rehearing.  (Resp't's Lod. Doc. 7.) Petitioner subsequently filed a petition for review in the California Supreme Court.  (Resp't's Lod. Doc. 8.)  That petition was also summarily denied.  (Resp't's Lod. Doc. 9.)

        Petitioner filed his federal habeas corpus petition in this court on September 13, 2012. (ECF No. 1.)  By order dated March 12, 2014, this court granted petitioner's motion for a stay of this action so that he could exhaust his claim that misconduct by the lead detective investigating his case violated his right to due process.  (ECF No. 8.)  On April 16, 2014, petitioner filed an exhaustion petition for writ of habeas corpus in the California Supreme Court.  (Resp't's Lod. Doc. 10.)  Therein, petitioner raised the same claims that he raises in the petition before this court,

1   including his claim that misconduct by the lead investigating detective in his case violated his

2   right to due process.  (Id.)  By order filed June 18, 2004, the California Supreme Court summarily

3   denied that petition, citing the decision in In re Robbins, 18 Cal.4th 770, 780 (1998).  (ECF No.

4   25-2.)

5          By order dated July 7, 2014, this court lifted the stay of this action and directed

6   respondent to file a response to petitioner's application for federal habeas relief.  (ECF No. 15.)

7   Respondent filed an answer on November 5, 2014, and petitioner filed a traverse on December 5,

8   2014.  (ECF Nos. 25, 27.)

9   **II.  Standards of Review Applicable to Habeas Corpus Claims**

10         An application for a writ of habeas corpus by a person in custody under a judgment of a

11  state court can be granted only for violations of the Constitution or laws of the United States.  28

12  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

13  application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

14  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir.

15  2000).

16         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

17  corpus relief:

18             An application for a writ of habeas corpus on behalf of a
     person in custody pursuant to the judgment of a State court shall not
19   be granted with respect to any claim that was adjudicated on the
     merits in State court proceedings unless the adjudication of the
20   claim -

21             (1) resulted in a decision that was contrary to, or involved
     an unreasonable application of, clearly established Federal law, as
22   determined by the Supreme Court of the United States; or

23             (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
24   State court proceeding.

25         For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

26  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

27  Greene v. Fisher, ___ U.S. ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859

28  (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent

1    "may be persuasive in determining what law is clearly established and whether a state court

2    applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561,

3    567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general

4    principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

5    not announced." Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013) (citing

6    Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to

7    "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

8    it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.  Further, where courts

9    of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

10   established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

11          A state court decision is "contrary to" clearly established federal law if it applies a rule

12   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

13   precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

14   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

15   writ if the state court identifies the correct governing legal principle from the Supreme Court's

16   decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2]  Lockyer v.

17   Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

18   (9th Cir. 2004).  A federal habeas court "may not issue the writ simply because that court

19   concludes in its independent judgment that the relevant state-court decision applied clearly

20   established federal law erroneously or incorrectly.  Rather, that application must also be

21   unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473

22   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

23   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

24   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

25   'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

26   _____

27   [2]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1   Richter, 562 U.S. 86,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S.

2   652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

3   court, a state prisoner must show that the state court's ruling on the claim being presented in

4   federal court was so lacking in justification that there was an error well understood and

5   comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 131

6   S. Ct. at 786-87.

7        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

8   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

9   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

10  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

11  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

12  de novo the constitutional issues raised.").

13       The court looks to the last reasoned state court decision as the basis for the state court

14  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

15  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

16  previous state court decision, this court may consider both decisions to ascertain the reasoning of

17  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

18  federal claim has been presented to a state court and the state court has denied relief, it may be

19  presumed that the state court adjudicated the claim on the merits in the absence of any indication

20  or state-law procedural principles to the contrary."  Richter, 131 S. Ct. at 784-85.  This

21  presumption may be overcome by a showing "there is reason to think some other explanation for

22  the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

23  803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

24  but does not expressly address a federal claim, a federal habeas court must presume, subject to

25  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

26  ___, 133 S. Ct. 1088, 1091 (2013).

27       Where the state court reaches a decision on the merits but provides no reasoning to

28  support its conclusion, a federal habeas court independently reviews the record to determine

1   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

2   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

3   review of the constitutional issue, but rather, the only method by which we can determine whether

4   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

5   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

6   reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

7          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

8   Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

9   just what the state court did when it issued a summary denial, the federal court must review the

10  state court record to determine whether there was any "reasonable basis for the state court to deny

11  relief."  Richter, 131 S. Ct. at 784.  This court "must determine what arguments or theories . . .

12  could have supported, the state court's decision; and then it must ask whether it is possible

13  fairminded jurists could disagree that those arguments or theories are inconsistent with the

14  holding in a prior decision of [the Supreme] Court."  Id. at 786.  The petitioner bears "the burden

15  to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

16  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S. Ct. at 784).

17         When it is clear, however, that a state court has not reached the merits of a petitioner's

18  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

19  habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

20  F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

21  **III.  Petitioner's Claims**

22         **A.  Destruction of Evidence**

23         In his first ground for federal habeas relief, petitioner claims that the state's "willful

24  destruction of evidence" violated his right to due process and that the loss of this evidence "meant

25  there was insufficient evidence to sustain a conviction for possession of child pornography."

26  (ECF No. 1 at 6.)[3]  In the petition before this court, counsel for petitioner alleged with respect to

27  ────────────────

28  [3]   Page number citations such as this one are to the page numbers reflected on the court's
     CM/ECF system and not to page numbers assigned by the parties.

this claim as follows:

> The willful destruction of evidence was a violation of due process. When the state went to copy the hard drive to examine it, there was an equipment malfunction that destroyed most of the hard drive. They could only salvage a portion of it. The state printed out hard copies of the thumbnail images at issue and destroyed the hard drive. The computer examiner believed there was no need to keep the hard drive as he believed there was no need to keep the hard drive as he believed the defendant would not be prosecuted based on what he had found. The defense retained an expert to look at the hard drive but he was unable to gather much information due to the damage to the hard drive. In trial, he said he could have retained a data recovery professional to attempt to reconstruct the drive but had not done so. The court found the hard copy images were admissible and the appellate court found no error. This destruction of evidence meant there was insufficient evidence to sustain a conviction for possession of child pornography.

(ECF No. 1 at 6.) [4]

Thus it appears that petitioner was initially complaining both about the destruction of part of the hard drive during the forensic copying as well as the subsequent intentional erasure of the part of the hard drive that had been successfully copied and contained the thumbnail files, which petitioner somewhat confusingly refers to only as the hard drive, due to lack of storage space and the agent's view at the time that they would not be needed. However, in the traverse, petitioner's counsel mentions only the latter, arguing as follows:

> In this case, the state's witness, Agent Sparks testified he knowingly and willfully, without notice to either side, destroyed the hard drives that were alleged to contain child pornography. He testified that it was his belief, despite being on notice of the pending trial and the associated charge of possession of child pornography , that he did not believe the evidence would suffice to support such a prosecution. [citation to record omitted] That the State's own agent admits he destroyed the evidence because he did not believe it would support prosecution demonstrates the obvious and apparent exculpatory value of the evidence he then willingly and knowingly destroyed.

(ECF No. 27 at 9.) [5]

---

[4]  The court does not mean to indicate that it concurs it counsel's characterization of the record in the allegations in support of this claim. It does not. Moreover, the allegation makes passing reference to the sufficiency of the evidence on the misdemeanor charge in connection with its central complaint focused on the alleged destruction of evidence.

[5]  See fn. 4, above

11

In any event, regardless of the scope and aim of petitioner's claim based upon the alleged destruction of evidence he has failed to make any showing that would entitle him to federal habeas relief with respect to that claim.

The California Court of Appeal explained the background to this claim:

> **A. Destruction of the Hard Drive and Thumbnail Computer Files**
>
> Defendant moved to dismiss the misdemeanor child pornography charge because the computer malfunctioned as an agent for the Department of Justice was copying the hard drive for a forensic examination, and six months later he destroyed the thumbnail computer files. He contends the destruction of defense evidence constitutes a denial of due process. We begin with a summary of how and when the computer data were destroyed.
>
> During a preliminary examination of defendant's hard drives, Michael Sparks, an agent with the California Department of Justice, Bureau of Investigation and Intelligence, found no child pornography. A detective from a police department in San Joaquin County informed Sparks that a technician had found a "thumbs database" containing child pornography on one of the hard drives. To facilitate a complete forensic analysis, Sparks initiated a copying process to occur overnight. When he returned the following day, however, he heard a clicking sound coming from the hard drive. He tried to restart it, but the hard drive was not working.
>
> The forensic software had copied about one-half of the hard drive before crashing. Sparks found three unusual software programs: Active Eraser, which deletes files completely; Ghost Surf, which hides a person's Internet protocol address when he is on the Internet; and Net Duster, which deletes a person's search history on the Internet.
>
> Sparks also found 24 thumbs database files containing what he believed to be child pornography. Each file matched with a "thumbnail" image, had a file name, a file path, and a date the image was placed on defendant's hard drive. But no larger images were recovered. The file path indicated that the "owner" had accessed and created the thumbnail files, but it did not indicate who, by name, created the images. All the images were placed on defendant's computer on May 19, 2006, between 7:39 p.m. and 8:01 p.m.
>
> Sparks kept the thumbnail files for approximately six months. Then, without notice to defendant, he erased them. He explained that, in his experience, thumbnail files like those found on defendant's computer were not prosecuted. He further explained that because of space limitations, his agency cannot save all the files it copies.

> A private forensic computer investigator who had examined the hard drive after it was damaged testified for the defense. He stated that thumbnail files are hidden files whose existence might not be known to the computer user. Defendant contends data on the hard drive might include information on the sites that originated the images and when the image files were accessed. The defense investigator had not, however, turned on the hard drives for fear of causing additional damage. He opined that a data recovery professional could disassemble the hard drive and try to read the data, but he had not requested the services of a data recovery professional. He did believe the software programs could be used for legitimate purposes.

Eickenhorst, 2011 WL 2436216, at * 7-8.

The California Court of Appeal rejected petitioner's argument on appeal that either the crashing of the hard drive halfway through the forensic copying process by law enforcement or the erasure of the thumbnail files from which the images of child pornography were downloaded and introduced at trial violated petitioner's constitutional rights. The state appellate court reasoned as follows:

> In California v. Trombetta (1984) 467 U.S. 479 [81 L.Ed.2d 413] (Trombetta), the United States Supreme Court held that a state violates a criminal defendant's right to due process when it destroys evidence that (1) has "an exculpatory value that was apparent before the evidence was destroyed" and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Id. at p. 489.) Defendant fails to establish either prong of the Trombetta test.
>
> Factually, two different acts resulted in the destruction of the evidence, the first inadvertent and the second intentional. As Sparks was copying the hard drive overnight, it crashed. Nevertheless, half of the material on the disk had been saved, including the thumbnail images. The court found that the crash was inadvertent. Sparks later erased the computer drives with the copied material, although the hard paper copy remained and was introduced at trial. Sparks testified he erased the computer drives after six months because he did not think defendant would be prosecuted and because the Department of Justice did not have the storage capacity to retain all copied materials.
>
> Defendant has presented no evidence that there was exculpatory evidence contained on the hard drives. Unlike the breath samples in Trombetta or the marijuana plants in United States v. Belcher (W.D. Va.1991) 762 F. Supp. 666, the evidence on the hard drives was not "absolutely critical and determinative" to the prosecution's case. (Id. at p. 672.) Indeed, defendant's expert merely speculated that there might be information on the hard drive that would indicate who downloaded the pornographic images. Such

13

speculation does not meet <u>Trombetta's</u> requirement that the exculpatory nature of the evidence must be apparent to law enforcement before a duty to preserve it arises.

Nor has defendant demonstrated that he is unable to obtain the exculpatory evidence by any other means. To the contrary, his own expert testified that a data recovery professional might have been able to recover the information he sought, but defendant failed to avail himself of this opportunity. Again, defendant must rely on pure speculation that the data would not have been recovered. Because he did not bear his burden of proving either that law enforcement was aware of the exculpatory value of the evidence or that he was unable to obtain the evidence by any other means, his due process claim fails.

Despite defendant's argument to the contrary, his due process claim also fails under the bad faith analysis required by the Supreme Court in <u>Arizona v. Youngblood</u> (1988) 488 U.S. 51, 57 [102 L.Ed.2d 281] (<u>Youngblood</u>). The state's obligation to preserve evidence is even more limited when it is only potentially exculpatory. According to <u>Youngblood</u> and its progeny, the defense must prove the state withheld or destroyed the evidence in bad faith. (<u>Illinois v. Fisher</u> (2004) 540 U.S. 544, 547–548 [157 L.Ed.2d 1060] (<u>Fisher</u>).) On appeal, we review for substantial evidence a trial court's factual finding whether the state acted in bad faith. (<u>People v. Memro</u> (1995) 11 Cal.4th 786, 831, 47 Cal.Rptr.2d 219, 905 P.2d 1305.)

Defendant reargues the evidence of bad faith. He insists Sparks acted in bad faith because he did not notify defendant, or his lawyer, before erasing the hard drives shortly before the trial. Yet, defendant points out, he was scheduled to testify. Moreover, defendant emphasizes there was no evidence that the destruction of the thumbnail files data was authorized by standard practices, standards of good investigation, or by judicial order. But defendant ignores the deferential scope of appellate review and forgets that it is his burden to demonstrate that the evidence was damaged or deleted in bad faith. (<u>Fisher</u>, <u>supra</u>, 540 U.S. at pp. 547–548.)

The record discloses ample evidence to support the trial court's finding that Agent Sparks did not act in bad faith when the copying apparatus malfunctioned or when he deleted the copied material six months later. The prosecution did not have to prove Sparks's conduct conformed to standardized practices and procedures. Rather, the court was at liberty to accept his representation that it was not feasible for his office to retain all copied hard drives. Here the absence of bad faith merely augmented the fundamental gaps in defendant's due process analysis since his claim is predicated on nothing more than the speculative notion that there might have been something exculpatory on the hard drive. But he failed to have a specialist attempt to recover the data to determine whether there was or not. As a result, he has failed to prove that his right to due process was violated under any of the standards enunciated in <u>Trombetta</u> or <u>Youngblood</u>.

14

1  Eickenhorst, 2011 WL 2436216, at *8-10.

2       As noted above, before this court petitioner argues that Agent Sparks' trial testimony that

3  he erased the hard drives containing the thumbnail files when he did because he was then of the

4  opinion that they would not be relied upon to support a criminal prosecution "demonstrates the

5  obvious and apparent exculpatory value of the evidence he then willingly and knowingly

6  destroyed." (ECF  No. 27 at 9.)  Petitioner also contends that Sparks destroyed the evidence

7  "despite being on notice of the pending trial and the associated charge of possession of child

8  pornography."  (Id.)  Citing the decision in Aklona v. United States, 938 F.2d 158, 161 (9th Cir.

9  1991), petitioner also argues that Agent Sparks' actions in destroying the thumbnail files would

10  support a jury finding that the prosecution was "likely to have been threatened" by that evidence

11  and that it was therefore exculpatory.  (Id) (citing Aklona, 938 F.2d at 161 ("Generally, a trier of

12  fact may draw an adverse inference from the destruction of evidence relevant to a case")).

13       Attached as exhibits to petitioner's habeas petition are declarations from petitioner's trial

14  counsel and a paralegal in trial counsel's office.  Therein, both declarants state that several jurors

15  told them after the verdict was rendered, that the testimony relating to petitioner's possession of

16  child pornography "led them to believe [petitioner] was more likely guilty of the lewd and

17  lascivious counts." (ECF No. 27 at 20-25.)  Based on these affidavits, petitioner argues that

18  "despite the recantation of the witness statements and lack of physical evidence against him, the

19  jury used the scant information left on the hard copy printouts of thumbnail size photographs

20  remaining after the evidence destruction to convict him of lewd and lascivious acts." (Id. at 10.)

21  In other words, petitioner appears to suggest that he was unfairly convicted of the child

22  molestation charges because the jury was allowed to view hard copies of photographs depicting

23  child pornography which were downloaded from the thumbnail files even though potential

24  evidence regarding the origin of those photographs, the partially copied hard drive, had been

25  willfully destroyed.

26       Throughout the underlying state court proceedings and now in seeking federal habeas

27  relief petitioner has argued that destruction of potentially exculpatory computer evidence by law

28  enforcement should be found fatal to his conviction.  Petitioner's argument was rejected by the

1   state courts because it is based on his pure speculation that the missing computer evidence "may"

2   have been helpful to the defense and because petitioner made no showing that law enforcement

3   agents acted in bad faith in connection with their handling of the computer evidence.  That

4   determination by the state courts should not be overturned on habeas review in light of the record

5   before this court.

6        Prior to trial petitioner's counsel moved in limine to have the possession of child

7   pornography charge dismissed due to alleged destruction of evidence and evidence was taken in

8   connection with that motion.  (RT 108-155.)  The motion was denied, with the trial court noting

9   that there had been no showing that the hard drive contained any exculpatory evidence and ruling

10  that the defense would be permitted to fully cross-exam the witnesses at trial on the issue of how

11  law enforcement handles the evidence.  (RT at 154-55.)  These issues were fully explored through

12  the direct and cross-examination of witnesses before the jury at petitioner's trial.  (See generally

13  RT 437-487; 971-1022.)  Through the testimony of its expert, petitioner's counsel was able to

14  present the defense theory that the thumbnail files containing child pornography may have been

15  placed on the computer without petitioner's knowledge and that he may have been unaware that

16  they were hidden there.  (RT at 971-1022.)  Petitioner's counsel reiterated that point to the jury in

17  his closing argument.  (RT 1257-59, 1768.).

18       A failure to preserve evidence violates a defendant's right to due process if the

19  unavailable evidence possessed "exculpatory value that was apparent before the evidence was

20  destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable

21  evidence by other reasonably available means."  California v. Trombetta, 467 U.S. 479, 489

22  (1984).  A defendant must also demonstrate that the police acted in bad faith in failing to preserve

23  potentially useful evidence.  Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Phillips v.

24  Woodford, 267 F.3d 966 (9th Cir. 2001).  The presence or absence of bad faith turns on the

25  government's knowledge of the apparent exculpatory value of the evidence at the time it was lost

26  or destroyed.  Youngblood, 488 U.S. at 56-57 n.*; see also United States v. Cooper, 983 F.2d

27  928, 931 (9th Cir. 1993).  The mere failure to preserve evidence which could have been subjected

28  to tests which might have exonerated the defendant does not constitute a due process violation.

1   *Youngblood*, 488 U.S. at 57; *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989).

2          Here, petitioner has failed to demonstrate a federal constitutional violation in light of the

3   applicable legal standards.  There is absolutely no evidence before this court suggesting that the

4   destroyed hard drive possessed any exculpatory value, no evidence that petitioner could not

5   obtain the information he sought from the destroyed records by other reasonably available means,

6   or that Agent Sparks knew of any exculpatory value that evidence could have presented at the

7   time it was destroyed.  It is important to recognize that bad faith on the part of the government in

8   this context "requires more than mere negligence or recklessness."  *United States v. Flyer*, 633

9   F.3d 911, 916 (9th Cir. 2011) (citing *Youngblood*, 488 U.S. at 59).  Petitioner's conclusory and

10  unsupported claims to the effect that Agent Sparks must have known there was exculpatory

11  information on the partial hard drive that he erased is clearly insufficient for this purpose.  *See*

12  *Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th

13  Cir. 1994) ("It is well-settled that '[c]onclusory allegations which are not supported by a

14  statement of specific facts do not warrant habeas relief'")).  As noted above, the mere possibility

15  that examination of the partially copied hard drive may possibly have revealed exculpatory

16  evidence is simply not enough to satisfy the <u>Trombetta</u> standards.  <u>See</u> <u>Illinois v. Fisher</u>, 540 U.S.

17  544, 538 (2004) (finding no due process violation resulting from destruction of evidence where

18  "at most, respondent could hope that, had the evidence been preserved, a . . . test conducted on

19  the substances would have exonerated him").

20         Under the circumstances of this case, the decision of the California Court of Appeal

21  rejecting petitioner's argument that his right to due process was violated due to the willful

22  destruction of evidence by the prosecution was not contrary to or an unreasonable application of

23  clearly established federal law.[6]  Accordingly, petitioner is not entitled to federal habeas relief

24  with respect to that claim.

_____

25  [6]  Likewise, any insufficiency of the evidence claim somehow connected to the alleged

26  destruction of evidence would also fail.  Copies of the photographs downloaded from the hard
    drive of petitioner's computer prior to the erasure of that partial hard drive were introduced into

27  evidence as part of the prosecution's case in chief.  The jury rejected petitioner's argument that
    those photographs could have been present on his computer as thumbnail files without his

28  knowledge.  There is no basis upon which to overturn that jury determination on habeas review.

**B.  Cruel and Unusual Punishment**

In his next ground for relief, petitioner argues that his sentence of 75 years to life imprisonment constitutes cruel and unusual punishment.  (ECF No. 1 at 8.)  Petitioner notes that he was "[a] defendant with no priors, who was between 18 and 20 when the offense occurred, who did not use force of any kind, who did not penetrate their genitals, who did not use violence, bodily harm, threats, or a high degree of cruelty."  (Id.)  Petitioner also observes that the sentencing court had discretion to "grant probation on some counts and/or run those sentences concurrent to the 15 years to life count."  (Id.)  Petitioner argues that "while the offenses as charged are serious, the allegations underlying the convictions show the conduct is relatively minor and thus the proportionality of the sentence violates the Eighth Amendment."  (ECF No. 27 at 12.)

**1.  State Court Decision**

The California Court of Appeal rejected these same arguments advanced by petitioner on appeal, reasoning as follows:

**IV. 75 Years to Life in State Prison**

> There is a stark disparity between the manner in which this case was treated by law enforcement and the district attorney's office before trial and the effective life sentence ultimately imposed. First, the case languished for years.  Nearly two years passed from the time A.C. and Brenna were interviewed on July 5, 2006, in San Joaquin County and the case was investigated in Kern County in 2008.
>
> Second, Department of Justice Agent Sparks testified that he destroyed the thumbnail computer files after about six months because in his experience the images he downloaded were generally considered insufficient to justify a prosecution for possession of child pornography.   He explained, "Because it's been my experience with this type of thumbnail views, that these type of cases are not prosecuted for child pornography.   And it's not feasible for us, as a task force, to save every evidence file that we copy."
>
> Third, the prosecution had agreed to an early disposition. Defendant went to court "prepared to enter pleas resolving the matter which would have prevented [him] from ever gaining employment in the teaching field, would have required registration as a sex offender, [and] would have saved the court, prosecution and victims the time, expense, inconvenience and embarrassment of

a trial." However, a different district attorney revoked the offer and refiled the charges.

Presumably the plea was predicated on the same factors defendant argued in mitigation. He had no prior offenses. He was between 18 and 20 years old when he committed the offenses. While any lewd contact involving young girls is serious, defendant used no force and did not penetrate their genitals. There is no evidence of violence, bodily harm, threats, or a high degree of cruelty, viciousness, or callousness. Indeed, when the victims told him they would not show him their "privates" or not to touch them, he complied. He touched one victim, if at all, on her hip and another on top of her clothes. He rubbed one victim's chest under her bikini top as she slept. The most egregious conduct involved Brenna, and if her interview is to be believed, he touched her vagina and she touched his penis. As defendant argued in his sentencing memorandum, the criminal conduct was very unsophisticated.

Yet the sentencing scheme for child molesters is harsh and the applicable statutes give the trial court little discretion to tailor the sentence to the offender and the nature of the conduct. Nevertheless, even the district attorney's sentencing memorandum recognized that not all of the possible five 15–years–to–life terms were mandatory. He wrote: "As will be explained below, the court is required, by operation of law, to sentence the Defendant to at least one 15 to Life term."

The life term to which the prosecutor referred was mandated under the so-called "one strike" law set forth at section 667.61. Section 667.61 prescribes a 15–years–to–life term for any person who is convicted of a crime enumerated in section 667.61, subdivision (c), which includes section 288, subdivision (a), under one of the circumstances enumerated in section 667.61, subdivision (e), which includes multiple victims. At first blush, defendant would appear to clearly fit the criteria. But there is another twist that complicates the calculation.

Section 667.61, former subdivision (c)(7) adds a proviso limiting the section 288, subdivision (a) offenses subject to a 15–years–to–life term. Former subdivision (c)(7) reads: "A violation of subdivision (a) of Section 288, unless the defendant qualifies for probation under subdivision (c) of Section 1203.066." Thus, if defendant qualifies for probation under section 1203.066, subdivision (c), the court would not be required to impose a 15–years–to–life term.

The prosecutor recognized that section 1203.066 has a special provision to accommodate relatives who become child molesters because of the deleterious effects on the child victims in testifying against family members. He therefore distinguished Jessica, who was not a relative, from the three cousins, who potentially were.

Defendant, however, does not contend that he was entitled to probation pursuant to section 1203.066. He does argue that

pursuant to the other conditions set forth in subdivisions (b) through (e) of section 1203.066, a grant of probation would be in the children's best interest because they are not angry at him, they did not want him to get into trouble, and they would not want him to serve a long prison term; he is amenable to treatment; and he can be ordered to stay away from the victims.  And he acknowledges that because Jessica is not a relative he does not satisfy section 1203.066, subdivision (a).  But he does not argue that he is a relative of the other three victims and therefore amenable to probation under the express factors set forth in section 1203.066 and thereby excepted from the mandatory 15–years–to–life term under section 667.16.

The analysis, if we were to delve into all of the sentencing nuances presented by amendments to section 1203.066 in 2004, 2005, and 2006, would become even more complicated.  The prosecutor conceded that the law in 2005 set forth a rebuttable presumption that defendant was ineligible for probation and that defendant therefore could present evidence to show he was entitled to consideration for probation.  As a consequence, the prosecutor did not argue that the 15–years–to–life terms were mandatory for one count involving Nicole and one involving A.C.

The trial court seemed less troubled by the nuances in the various iterations of the law and made no mention of the relative exception recognized by section 1203.066, subdivision (a).  The court ruled: "First of all, it is a negative probation report as far [sic] 1203.066.  There is language in there about possibilities for probation, but I don't think that probation is appropriate in this case.  The number one reason is the number of counts, the fact that there are multiple victims."  After recognizing the harsh consequences of California's sentencing laws, the court imposed five consecutive 15–years–to–life terms.

Defendant challenges his sentence on one ground only.  He contends the imposition of a 75–years–to–life sentence constitutes cruel and unusual punishment under the federal and state Constitutions.  Even his constitutional challenge is limited in scope.  As the Attorney General points out, he does not mount a facial challenge to the constitutionality of section 667.61; he does not dispute that section 667.61's elevated punishment was triggered by his convictions against more than one victim; he does not dispute that the court was required to impose separate terms (§ 667.61, subd.(i)); nor does he contend the trial court lacked discretion to order him to serve the terms consecutively.

Rather, defendant argues that but one of the three factors delineated in In re Lynch (1972) 8 Cal.3d 410, 424, 105 Cal. Rptr. 217, 503 P.2d 921 demonstrates that his sentence constitutes cruel and unusual punishment.  In his view, the nature of the offense and the offender do not merit a 75–years–to–life term.  He relies on a lone concurring opinion in People v. Deloza (1998) 18 Cal.4th 585, 600–602, 76 Cal.Rptr.2d 255, 957 P.2d 945 (Deloza) in which Justice Mosk opined that a sentence that is impossible to serve is per se cruel and unusual.  Established law is to the contrary.

We have rejected reliance on Justice Mosk's concurrence.   In People v. Retanan (2007) 154 Cal. App.4th 1219, 1231, 65 Cal. Rptr.3d 177, we wrote: "'"[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court.   [Citations.]" [Citations.]   Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion [in Deloza], it has no precedential value.'   Accordingly, there is no authority for defendant's argument."   We again reject the notion that a sentence of 75 years to life is cruel and unusual because it is impossible for a human being to complete.

Nor do the facts surrounding the commission of the offenses or an individualized assessment of the offender compel a different result. As noted above, we are well acquainted with the factors in mitigation, including defendant's age, his lack of a criminal record, his training in education, and his willingness to stop at the request of his victims.   Subservient to the legislative prerogative to prescribe extremely long terms of incarceration and the trial court's exercise of discretion in sentencing, an intermediate Court of Appeal's role is exceedingly limited.   Whatever our misgivings about the length of the sentence imposed here, the sentence is not unconstitutional.

Lengthy sentences, indeed far longer than the 75–years–to–life term defendant must serve for multiple sex offenses, have survived constitutional scrutiny and have not shocked the conscience of the reviewing courts.   (People v. Bestelmeyer (1985) 166 Cal. App.3d 520, 531, 212 Cal. Rptr. 605; People v. Estrada (1997) 57 Cal. App.4th 1270, 1278–1282, 67 Cal. Rptr.2d 596; People v. Cartwright (1995) 39 Cal. App.4th 1123, 1132, 1134–1136, 46 Cal. Rptr.2d 351; People v. Wallace (1993) 14 Cal. App.4th 651, 666–667, 17 Cal. Rptr.2d 721.)   Here defendant, taking advantage of his familial relationship with three of his young victims and of the trust of the fourth because he was a close family friend, molested seven- and eight-year-old girls on five separate occasions and made them promise to keep it a secret.   The Legislature has constructed an exceedingly harsh sentencing scheme to incarcerate child molesters, and given the multiple violations of section 288, subdivision (a) against multiple victims, we cannot say his sentence violates either the state or federal Constitutions.

Eickenhorst, 2011 WL 2436216, at *12 -15.

## 2.  Applicable Law

The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishments."  U.S. Const. amend. VIII.  The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment.  See Graham v. Florida, 560 U.S. 48, 60 (2010); Harmelin v. Michigan, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring).  See also Taylor v. Lewis, 460 F.3d 1093, 1097 (9th

Cir. 2006).  However, the precise contours of this principle are unclear, and successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289-90 (1983).  See also Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring) (citing Solem v. Helm).

In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible.  Solem, 463 U.S. at 290. Foremost among these factors are the severity of the penalty imposed and the gravity of the offense.  "Comparisons among offenses can be made in light of, among other things, the harm caused or threatened to the victim or society, the culpability of the offender, and the absolute magnitude of the crime."  Taylor, 460 F.3d at 1098.

The following decisions of the United States Supreme Court illustrate these principles.  In Harmelin, the Supreme Court upheld a life sentence without the possibility of parole for a first-time offender convicted of possessing 672 grams of cocaine.  Harmelin, 501 U.S. at 961.  In Lockyer v. Andrade, the Supreme Court held that it was not an unreasonable application of clearly established federal law for the California Court of Appeal to affirm a "Three Strikes" sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior conviction involving theft of $150.00 worth of videotapes.  Andrade, 538 U.S. at 75.  In Ewing v. California, 538 U.S. 11, 29 (2003), the Supreme Court held that a "Three Strikes" sentence of 25 years-to-life in prison imposed on a grand theft conviction involving the theft of three golf clubs from a pro shop was not grossly disproportionate and did not violate the Eighth Amendment.  In Hutto v. Davis, 454 U.S. 370 (1982), the Supreme Court upheld the defendant's sentence of 40 years in prison after his conviction for possession of nine ounces of marijuana and drug paraphernalia.  Hutto, 454 U.S. at 370.  Finally, in Rummel v. Estelle, 445 U.S. 263 (1980), the Supreme Court upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony:  obtaining money by false pretenses.

/////

22

1   Federal circuit courts have upheld similarly lengthy sentences.  See e.g., Crosby v.

2   Schwartz, 678 F.3d 784, 791-92 (9th Cir. 2012) (sentence of 26 years to life under California's

3   Three Strikes Law for the defendant's failure to annually update his registration as a sex offender

4   and failure to register within five days of a change of address did not constitute cruel and unusual

5   punishment, in violation of the Eighth Amendment); Norris v. Morgan, 622 F.3d 1276, 1285-96

6   (9th Cir. 2010) (upholding a sentence of life in prison without the possibility of parole under

7   Washington's "Two Strikes Law" following the defendant's conviction for child molestation,

8   which involved "touching a five-year-old girl on her 'privates' or 'genitalia' and over her clothing

9   for at most 'a couple of seconds.'"); Taylor, 460 F.3d at 1098 (upholding a "Three Strikes"

10  sentence of twenty-five years to life in prison for possession of 36 milligrams of cocaine).  Cf.

11  Moore v. Biter, 725 F.3d 1184, 1186, 1190 (9th Cir. 2013), rehearing denied, ___ F.3d ___, No.

12  11–56846, 742 F.3d 917, 2014 WL 552775 (9th Cir. Feb. 2, 2014) (concluding that a sentence of

13  254 years and four months in prison violated the Eighth Amendment proscription against cruel

14  and unusual punishment where the petitioner was a juvenile when he committed various sex and

15  non-sex offenses).

16  **3. Analysis**

17  Pursuant to the authorities cited above, the sentence imposed on petitioner, while most

18  certainly quite harsh[7], is not grossly disproportionate to his crimes of conviction so as to render it

19  unconstitutional.  As noted by the California Court of Appeal, petitioner "molested seven- and

20  eight-year-old girls on five separate occasions and made them promise to keep it a secret."

21  Eickenhorst, 2011 WL 2436216, at *15.  The Ninth Circuit has observed that "[t]he impact of

22  [child molestation] on the lives of [its] victims is extraordinarily severe."  Norris, 622 F.3d at

23  1294 (quoting Cacoperdo v. Demosthenes, 37 F.3d 504, 508 (9th Cir. 1994).  Petitioner's crimes

24  are more serious than the petty theft convictions before the court  in Andrade, the shoplifting

25  conviction in Ewing, the conviction for obtaining money under false pretenses at issue in

26

27  [7]  In affirming petitioner's judgment of conviction and sentence, the California Court of Appeals
     stated:  "Whatever our misgivings about the length of the sentence imposed here, the sentence is
28  not unconstitutional."  Eickenhorst, 2011 WL 2436216, at *15.

1   Rummel, and the conviction for possession of .036 grams of cocaine in Taylor, all of which

2   involved the imposition of sentences which were upheld against an Eighth Amendment challenge.

3   Moreover, as noted by the California Court of Appeal, the California legislature has authorized

4   "extremely long terms of incarceration" for crimes involving sexual molestation of children, and

5   petitioner has pointed to no clearly established Supreme Court precedent that "forecloses that

6   legislative choice." See Ewing, 538 U.S. at 30 n. 2; Hutto, 454 U.S. at 372 (the United States

7   Supreme Court "has never found a sentence for a term of years within the limits authorized by

8   statute to be, by itself, a cruel and unusual punishment.").

9          For the reasons explained above, this is not a case where "a threshold comparison of the

10   crime committed and the sentence imposed leads to an inference of gross disproportionality."

11   Solem, 463 U.S. at 1004-05.  Because petitioner does not raise an inference of gross

12   disproportionality, this court need not compare petitioner's sentence to the sentences of other

13   defendants in other jurisdictions.  Harmelin, 501 U.S. at 1005; United States v. Meiners, 485 F.3d

14   1211, 1213 (9th Cir. 2007) ("in the rare case in which a threshold comparison [of the crime

15   committed and the sentence imposed] leads to an inference of gross disproportionality, we then

16   compare the sentence at issue with sentences imposed for analogous crimes in the same and other

17   jurisdictions.").

18          For all of these reasons, the decision of the California Court of Appeal rejecting

19   petitioner's argument that his sentence constitutes cruel and unusual punishment in violation of

20   the Eighth Amendment was neither contrary to nor an unreasonable application of well-

21   established federal law.  Moreover, that decision was certainly not "so lacking in justification that

22   there was an error well understood and comprehended in existing law beyond any possibility for

23   fairminded disagreement."  Richter, 131 S. Ct. at 786–87.  Accordingly, petitioner is not entitled

24   to federal habeas relief with respect to this claim.

25          **C. Misconduct of Lead Detective**

26          In his final claim for relief, petitioner argues that his right to "due process and a fair trial"

27   was violated when the "lead detective" assigned to investigate his case committed misconduct in

28   connection with another criminal prosecution.  (ECF No. 1 at 9.)  In his petition before this court,

petitioner explains:

> Petitioner's appellate counsel received notification that the lead detective on the case was the subject of an Internal Affairs Investigation that resulted in administrative action being taken against Detective Nathan Cogburn for conduct occurring in his capacity as a law enforcement officer.   Det. Cogburn was apparently found to have led a child witness into making false accusations.  This information was not disclosed to the defense until after Internal Affairs completed their investigation and took action.

(Id.)

However, in his traverse petitioner clarifies that the misconduct committed by Detective Cogburn did not concern manipulation of child witnesses.  Rather, according to a Contra Costa Times newspaper article of June 24, 2010, submitted by petitioner as an exhibit to his traverse, Cogburn was placed on paid administrative leave after he told a murder suspect, following her invocation of her right to remain silent, that she should talk to the lead detective or she would "spend the rest of her life in prison or she would rot in hell," and then deleted these remarks by him from his tape recorder.  (See ECF No. 27 at 28-29.)  After Detective Cogburn realized his recorder had been running while he was talking to the murder suspect, he deleted his statements from the device.  (Id. at 28.)  However, he immediately realized this had been "a mistake," and decided to remedy the situation by documenting his remarks in a "narrative report form."  (Id. at 29.)

Detective Cogburn's misconduct occurred on April 9, 2009, several weeks prior to petitioner's trial, which began on April 23, 2009.  It appears that Detective Cogburn was not suspended until June, 2010.  (Id. at 28.)  The San Joaquin County District Attorney notified petitioner's trial counsel[8] in a letter dated December 10, 2010, that administrative action had been taken against Detective Cogburn.  That letter stated:

---

[8]  As noted, petitioner alleges that it was his appellate counsel who received notification that the lead detective on the case was the subject of an Internal Affairs investigation that resulted in administrative action being taken against him. (ECF No. 1 at 9.)  However, the letter submitted as an exhibit by respondent reflects that the notification so advising petitioner was addressed and directed to his trial counsel on December 10, 2010.  In any event, whether the letter was directed to petitioner's trial or appellate counsel is of no significance to resolution of the issue before this court.

1

> This letter is to inform you that an Internal Affairs investigation has resulted in administrative action being taken by the Tracy Police Department against Detective Nathan Cogburn for conduct which occurred in his capacity as a law enforcement officer.   Nathan Cogburn was involved in the Case of TM112335A.

2

3

4  (Resp't's Lod. Doc. 10, Ex. 1.)

5  Tracy Police Department Detective Cogburn testified at petitioner's trial.  He testified that

6  he obtained two computers from petitioner's residence after police conducted a search of the

7  house pursuant to a search warrant.  (Reporter's Transcript on Appeal (RT) at 438.)  Cogburn

8  suspected that child pornography might be contained on the computers.  (Id.)  He testified that,

9  while there was a task force in Sacramento that typically searched computers for "that type of

10  thing," he did not immediately send the computers to the task force.  (Id. at 440.)  Instead, he

11  conducted a preliminary examination of the computers on his own, using a program called

12  "Forensic Tool Kit."  (Id.)  Detective Cogburn explained:

13

> We'll run the program through that hard drive to see what images were stored or still maintained on that hard drive.  And we'll do that to see, just preliminarily, do we have evidence that there's any sort of suspected child porn on the hard drive before we send the computers up to the task force.  They are very busy.

14

15

16  (Id. at 440-41.)

17  Detective Cogburn further testified that Officer Fred Kelly of the Tracy Police

18  Department ran the Forensic Tool Kit through petitioner's hard drive.  (Id. at 441, 448.)

19  According to Coburn, Officer  Kelly found approximately 20 images of suspected child

20  pornography.  However, he wanted to "get more, to show not only was there just the 20 images,

21  but to show that there were more even beyond that amount, that would be on the computer."  (Id.

22  at 448-49.)  Although Kelly did not find any additional images, he then sent both computers to the

23  High Tech Task Force in Sacramento.  (Id.)  Detective Cogburn further testified that he was not

24  sure whether a copy was made of petitioner's hard drive before the forensic analysis was

25  conducted by the Tracy Police Department.  (Id. at 446.)

26  Petitioner argues that Detective Cogburn's actions in deleting his improper remarks from

27  his tape recorder in the unrelated 2009 murder case proves that he "will go to any lengths to

28  secure a conviction including disregarding a defendant's rights and destroying evidence."  (ECF

No. 27 at 16.)  Petitioner also complains that Cogburn made several statements during his trial

testimony that were designed to "entice the jury to place undue emphasis on the photographs

alleged to have been found on the hard drive."  (Id.)  For instance, Cogburn testified:

> Say you have an individual that you suspect of molesting multiple
> individuals, it would not be altogether uncommon that that person,
> while on the internet or surfing the web or what have you, would
> look up images of underage minors, if that's what they were into
> sexually.

(RT at 439.)  Petitioner argues that the evidence concerning Detective Cogburn's misconduct in

the unrelated 2009 murder investigation, along with Cogburn's above-described testimony at

petitioner's trial, raises "a genuine factual dispute regarding the destruction of evidence and it

warrants a hearing."  (ECF No. 27 at 16.)

Petitioner raised this due process claim for the first time in his habeas petition filed in the

California Supreme Court.  (Resp't's Lod. Doc. 10.)  The Supreme Court denied that petition,

citing In re Robbins (1998) 18 Cal.4th 770, 780.  (ECF No. 25-2.)  Respondent argues that the

California Supreme Court's denial of his habeas petition with such a citation to In re Robbins

constitutes a state procedural timeliness bar which precludes this federal habeas court from

considering the merits of petitioner's claim that his right to due process was violated by Detective

Cogburn's misconduct.  (ECF No. 25 at 27-28.)

"A federal habeas court will not review a claim rejected by a state court 'if the decision of

[the state] court rests on a state law ground that is independent of the federal question and

adequate to support the judgment.'"  Walker v. Martin, 562 U.S. 307, ___, 131 S. Ct. 1120, 1127

(2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)).  See also Coleman v. Thompson, 501

U.S. 722, 729 (1991).  California's time limitation requiring the filing of petitions seeking habeas

relief without "substantial delay" has now been found by the U.S. Supreme Court to be an

"independent" and "adequate" state law ground for purposes of the procedural default rule.

Walker v. Martin, 131 S. Ct. at 1128-30.  See also Abedi v. Grounds, No. 11-18010, 500 Fed.

Appx. 668, at *1 (9th Cir. Dec. 12, 2012) (citing Walker v. Martin for the proposition that

"California's In re Robbins, 18 Cal.4th 770, 780, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998), rule

constitutes an independent and adequate state procedural bar to federal habeas review, despite

1   discretionary application"); <u>Alvarez v. Wong</u>, No. 09-15547, 2011 WL 1252307, at *1 (9th Cir.

2   Apr. 5, 2011) ("The Supreme Court recently held that denial of habeas relief by the California

3   Supreme Court on the ground that the application for relief was filed untimely was an

4   independent and adequate state procedural ground requiring denial of a subsequent habeas

5   petition in federal court . . . ."); [9] <u>Lee v. Almager</u>, No. CV 08-3248-PA(E), 2011 WL 2882148 at

6   *7-8 (C.D. Cal. June 7, 2011) (finding federal habeas corpus claim procedurally barred because

7   the California Supreme Court had denied relief citing to <u>In re Robbins</u>; "[t]he <u>Walker</u> Court

8   rejected all arguments that California's timeliness rule was not firmly established and regularly

9   followed"); <u>Johnson v. Cullen</u>, No. 3-98-cv-4043-SI, 2011 WL 2149313, at *3 (N.D. Cal. June 1,

10  2011) (finding the <u>Walker</u> holding directly applicable and striking all federal habeas claims found

11  to be untimely by California Supreme Court); <u>Taylor v. McDonald</u>, Civil No. 10-cv-0177

12  MMA(BGS), 2011 WL 3021838 at *8-9 (S.D. Cal. Mar. 7, 2011) (finding federal habeas corpus

13  claims procedurally barred because "[t]he Supreme Court held California's untimeliness rule is

14  'adequate' for procedural default purposes when the petitioner subsequently presents for federal

15  habeas relief the same claims that were rejected on untimeliness grounds in state court.").

16      Petitioner has not alleged any facts to cast doubt on the adequacy or application of

17  California's habeas time limitation rule.  <u>See</u> <u>Bennett v. Mueller</u>, 322 F.3d 573, 586 (9th Cir.

18  2003); <u>Almager</u>, 2011 WL 2882148 at *7 (even assuming arguendo that the <u>Bennett</u> burden

19  shifting scheme applies after the decision in <u>Walker</u>, petitioner had not met his interim burden of

20  demonstrating the inadequacy of the California timeliness bar).  Petitioner also failed to assert

21  that the California Supreme Court exercised its discretion in a "surprising or unfair" manner or in

22  a way that "discriminates against claims of federal rights" when it denied his state petition as

23  untimely.  <u>See</u> <u>Walker</u>, 131 S. Ct. at 1131.

24      Even if a state procedural rule is independent and adequate, the claims may still be

25  reviewed by the federal habeas court if the petitioner can show:  (1) cause for the default and

26  actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider

27

28
_____

[9]   Citation of these unpublished dispositions by the Ninth Circuit Court of Appeals is appropriate
pursuant to Fed. R. App. P. 32.1 and U.S. Ct. of App. 9th Cir. Rule 36-3(b).

1   the claims will result in a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S.

2   446, 451 (2000); Coleman, 501 U.S. at 749-50; see also Maples v. Thomas, ___ U.S. ___, 132 S.

3   Ct. 912, 922 (2012).  "[T]he existence of cause for a procedural default must ordinarily turn on

4   whether the prisoner can show that some objective factor external to the defense impeded . . .

5   efforts to comply with the state's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).

6   See also Coleman, 501 U.S. at 753 ("cause" under the cause and prejudice test must be something

7   external to the petitioner that cannot be fairly attributed to him); Smith v. Baldwin, 510 F.3d

8   1127, 1146 (9th Cir. 2007) ("In order to establish cause for a procedural default, a petitioner must

9   demonstrate that the default is due to an external objective factor that 'cannot fairly be attributed

10   to him.'")  Although petitioner does not specifically argue that he has established cause for his

11   procedural default, he does explain that he was not advised of, and therefore did not discover,

12   Detective Cogburn's misconduct until after his trial had concluded.  (ECF No. 27 at 16.)

13   Petitioner also argues that this due process claim "relates back" to his timely filed direct appeal in

14   which he argued that the destruction of evidence by California Department of Justice Agent

15   Michael Sparks violated his right to due process.  (Id. at 14.)

16         Assuming arguendo that petitioner has established cause to excuse his procedural default

17   with respect to this claim for relief, he has failed to demonstrate prejudice in order to overcome

18   the procedural bar imposed by the California Supreme Court.  "To establish prejudice resulting

19   from a procedural default, a habeas petitioner bears 'the burden of showing not merely that the

20   errors at his trial constituted a possibility of prejudice, but that they worked to his actual and

21   substantial disadvantage, infecting his entire trial with errors of constitutional dimension.'"

22   White v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) (citing United States v. Frady, 456 U.S. 152,

23   170 (1982)).  Petitioner has failed to make this showing.  The misconduct committed by Detective

24   Cogburn occurred in another case and had nothing to do with any issue at petitioner's trial.  There

25   is no evidence that Cogburn destroyed evidence in petitioner's case.  There is also no evidence

26   that Detective Cogburn's testimony at petitioner's trial was false in any respect or that the

27   prosecutor presented it despite knowing that the testimony was false.  See United States v.

28   Bagley, 473 U.S. 667, 680 n.9 (1985) ("A conviction obtained by the knowing use of perjured

1   testimony must be set aside if there is any reasonable likelihood that the false testimony could

2   have affected the jury's verdict"); Henry v. Ryan, 720 F.3d 1073, 1084 (9th Cir. 2013) (claim that

3   his due process rights were violated by the knowing use of false testimony denied where

4   petitioner failed to demonstrate that witness knowingly provided false testimony during trial);

5   Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids

6   a conviction where the false evidence is 'known to be such by representatives of the State.'")

7   (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).

8          Under these circumstances and in light of the record before this court, petitioner has failed

9   to demonstrate that Detective Cogburn's misconduct in an unrelated 2009 murder case

10  investigation infected his own trial with constitutional error.[10]  Petitioner has also failed to

11  demonstrate that this court's failure to consider his habeas claims based upon the detective's

12  alleged misconduct will result in a fundamental miscarriage of justice, see Bennett, 322 F.3d at

13  580, or that he is factually innocent of the crimes for which he was convicted.  See Gandarela,

14  286 F.3d at 1085–86 ("A petitioner may establish a procedural gateway permitting review of

15  defaulted claims if he demonstrates "actual innocence") (citing Schlup v. Delo, 513 U.S. 298, 327

16  (1995)).

17         For the reasons set forth above, petitioner has failed to demonstrate cause and prejudice to

18  excuse the procedural default of his due process claim based upon the alleged misconduct of

19  Detective Cogburn.  Accordingly, that claim is procedurally defaulted and barred from federal

20  habeas review.

21  **IV. Conclusion**

22         Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that

23  petitioner's application for a writ of habeas corpus be denied.

24  /////

25  [10]   Petitioner's unsupported claim that the misconduct committed by Detective Cogburn in the
26  2009 murder case investigation created "a genuine factual dispute regarding the destruction of
    evidence" in petitioner's case is insufficient to demonstrate prejudice.  See Jones, 66 F.3d at 204
27  (conclusory allegations do not warrant habeas relief).  In any event, the destruction of evidence
    alleged by petitioner took place while the computer evidence was in the possession of Agent
28  Sparks of the High Tech Task Force and not while it was within Detective Cogburn's control.

1    These findings and recommendations are submitted to the United States District Judge

2  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3  after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within fourteen days after service of the objections.  Failure to file

7  objections within the specified time may waive the right to appeal the District Court's order.

8  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

9  1991).  In his objections petitioner may address whether a certificate of appealability should issue

10 in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing

11 Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

12 enters a final order adverse to the applicant).

13 Dated:  February 6, 2015

14

15 _____

DALE A. DROZD

16 UNITED STATES MAGISTRATE JUDGE

17 DAD:8:
Eickenhorst2363.hc

18

19

20

21

22

23

24

25

26

27

28

31